2013 VT 97

### In re Ferrera & Fenn Gravel Pit

[87 A.3d 483]

No. 12-456

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed October 18, 2013

*Mark G. Hall* of *Paul Frank + Collins P.C.*, Burlington, and *Charles J. Ferrera*, Honolulu, Hawaii, for Appellants.

*Benjamin W. Putnam* of *Neuse, Duprey & Putnam, P.C.*, Middlebury, for Appellee.

¶ 1. **Dooley, J.** Applicant Charles Ferrera and property owners Ronald and Susan Fenn (hereafter "applicants") appeal from a decision of the Superior Court, Environmental Division affirming the Town of Middlebury's denial of their application to operate a gravel pit. Applicants contend: (1) several key findings and conclusions were unsupported by the evidence; and (2) provisions of the Town's zoning regulations are unconstitutionally vague. We affirm.

¶ 2. We first summarize the salient facts and procedural history. Additional material facts will be set forth in the discussion that follows. Applicants submitted a proposal to construct a gravel pit on a 71.5-acre property adjacent to Route 116 in the Town of Middlebury. Just north of the proposed project site is the Lindale residential community; to the west across Route 116 is another residential area known as the Butternut Ridge neighborhood. Several existing gravel-extraction companies also operate within several miles of the project.

¶ 3. Applicants' property lies within both a Medium Density Residential (MDR) and Forest Conservation District. The proposed sixteen-acre gravel pit lies entirely within the Forest District, while the proposed 2300-foot access road from Route 116

crosses through both districts. Although gravel extraction is not allowed in the MDR district, it is a conditional use in the Forest District, and the Design Review Board (DRB) consequently subjected the proposal to conditional-use review under a provision of the Town's zoning regulations requiring application of the rules pertaining to the "less restricted district" in mixed-zoning districts. Town of Middlebury Zoning & Subdivision Regulations § 430(10) (hereafter "Regulations").

¶ 4. The DRB conducted a site visit in October 2008, and held public hearings over the course of ten days concluding in August 2010. A thirteen-page written decision issued the following month. The DRB concluded that the proposed project failed to comply with eight provisions of the zoning regulations, including the requirement that the project "shall not have an undue adverse effect on the character of the neighborhood, or area affected," Regulations § 540.III.B.1, and the noise-performance standard limiting "[n]oise volume . . . to levels that will not be a nuisance to adjacent uses." *Id.* § 750.I. More specifically, the DRB found that, despite the existence of several other gravel pits within a few miles of the project site, the proposed new gravel pit — located in closer proximity to the adjacent residential neighborhoods — would substantially increase the noise in the area, stating: "The Lindale/Butternut neighborhood would, with the added proposed gravel pit and truck traffic, . . . experience substantial added noise from a closer source." Along with the noise, the added "dust, industrial level traffic and impacts on the land" resulting from "the increased proximity and intensity of the proposed project would," in the DRB's view, "be adverse." The DRB thus concluded that "the addition of another operation, as proposed, will disrupt the balanced diversity of uses currently in place and will disturb the essential character of the existing neighborhoods." The application, accordingly, was denied.[1]

¶ 5. Applicants appealed the ruling to the Environmental Division, which conducted an on-the-record review based on the

[1] In addition, the DRB found that: increased traffic from the proposed project and "associated noise, exhaust and visual impacts" would have an undue adverse impact on the area's aesthetics; that the project raised traffic-safety concerns; applicants had not met their burden of showing that there would be no adverse impact on the acquifer/wellhead protection area in which the project was located; the proposed noise-mitigation berms failed to comply with setback requirements; and the project was not in conformance with the Town Plan.

transcribed hearings before the DRB and the parties' supplemental briefing. See 24 V.S.A. § 4471(b) (providing that Environmental Division may review municipal decisions "on the record" where local legislative body has so authorized). The court issued a written decision in November 2012, affirming the DRB's denial of the application.[2] This appeal followed.

¶ 6. Applicants challenge several of the DRB's findings and conclusions as unsupported. Our review is limited. Where, as here, review by the Environmental Division is on the record, our standard of review on appeal is the same as that used by the trial court. See *Devers-Scott v. Office of Prof'l Regulation*, 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230 ("Where there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal." (quotation omitted)); accord *In re Stowe Highlands Resort PUD to PRD Application*, 2009 VT 76, ¶ 7, 186 Vt. 568, 980 A.2d 233 (mem.). Thus, we will affirm the findings of the DRB if reasonably supported by the evidence. *Devers-Scott*, 2007 VT 4, ¶ 6. Our role is not to reweigh the evidence, and we will "defer to the finder of fact when there is conflicting evidence in the record." *Id.* Conclusions of law, however, are analyzed independently "where such conclusions are outside the DRB's area of expertise." *In re Stowe Highlands Resort*, 2009 VT 76, ¶ 7.

¶ 7. Applicants first focus on the DRB's finding, based on the testimony of their traffic engineer, that the proposed gravel pit would generate one truck trip every six minutes — or ten per hour — during operation. Applicants acknowledge that the DRB was "correct that the maximum frequency would be ten truck trips per hour" but "question . . . whether it is fair or legal to . . . judge the impact of the project on the basis of this maximum." They cite evidence that the "average hourly" number of trips would correspond to one trip every twelve minutes and that loaded trips would average about once every twenty-four minutes.

¶ 8. ■ ■ Applicants must do more, however, than simply "question" the DRB's reliance on the maximum number of trips

---

[2] Although the trial court concluded that the evidence failed to support the DRB's findings on traffic safety and further found that the Town Plan was insufficiently specific to support the DRB's findings of nonconformance, it affirmed on the basis of the project's failure to comply with the remaining zoning requirements as found by the DRB.

per hour; they must show that this was reversible error. See *In re S.B.L.*, 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) ("It is the burden of the appellant to demonstrate how the lower court erred warranting reversal."); V.R.A.P. 28(a)(4)(A) (appellant's brief must set forth the issues presented, how they were preserved, and "appellant's contentions and the reasons for them — with citations to the authorities, statutes, and parts of the record on which the appellant relies"). Applicants have not cited any law or authority or advanced any argument to support their claim, nor have we discovered any basis to conclude that the DRB may not rely on the maximum number of trips in assessing the project's impact on the character of the area. As the trial court here observed, "[w]e know of no barrier to a land use panel relying upon the maximum or most onerous impacts a project may have when attempting to determine if that project will bring undue adverse impacts to a neighborhood." Absent such a showing, we discern no basis for a finding of error.

¶ 9. Applicants also contend the evidence failed to support the DRB's finding that noise generated by the project would violate the noise-performance standard and detrimentally affect the character of the area. They assert that the evidence showed, on the contrary, that the project "would add only trivially to the already-existing noise level." Applicants rely on the report and testimony of their acoustical expert that the project would not significantly increase the average daily decibel level at nearby residences and that the average would not exceed the 55-decibel standard employed by the Environmental Board under Act 250.

¶ 10. The DRB, however, declined to apply the daily average, finding that the frequency and volume of noise generated during peak hours of operation constituted a more meaningful measure of the project's impact on the area. The DRB also declined to apply the 55-decibel standard, relying instead on the specific noise-performance standard set forth in the Town's zoning regulations, which provides, in pertinent part, as follows: "Noise volume shall be limited to levels that will not be a nuisance to adjacent uses. . . . Noise levels or frequencies which are not customary or reasonably expected in consideration of the character of the district or neighborhood and which represent a substantial repeated disturbance to others shall be presumed to constitute a nuisance." Regulations § 750.I.

¶ 11. Applying this standard, the DRB concluded that the project would add significantly "to the intensity of what currently exists in this area" and represent a "substantial repeated disturbance." Although applicants maintain that this conclusion was based solely on the "unfounded conjecture and hyperbole" of area residents, it finds adequate support in the record, including the testimony of applicants' own expert, who acknowledged that trucks traveling on or near Route 116 would measure over seventy decibels "as they go by your house." Numerous and repeated truck trips generated by the proposed project could thus create an additional, substantial, and continual disturbance to the nearby residential neighborhoods. Applicants also challenge the DRB's finding that — contrary to the opinion of their expert — proposed berms or barriers would not adequately mitigate the adverse impact of the project. The expert's opinion was based on the average-decibel standard, however, and was ultimately not responsive to the DRB's more comprehensive concerns about "noise, dust, industrial level traffic and impacts on the land" generated by the project. See *In re John A. Russell Corp.*, 2003 VT 93, ¶ 33, 176 Vt. 520, 838 A.2d 906 (mem.) (holding that proper analysis of proposed asphalt plant's impact on character of area should have included "neighbors' complaint that the frequency of loud noise would increase and affect the use and enjoyment of nearby residences" even where overall decibel levels would not exceed limits in preexisting permits). Accordingly, we discern no basis to disturb the findings.[3]

¶ 12. Applicants further contend the DRB mischaracterized the "neighborhood" or "area" affected by the project to include the Lindale and Butternut Ridge residential neighborhoods lying just to the north and west of the project respectively, and consequently misconstrued the project's impact on the "character"

---

[3] Applicants also summarily claim that the DRB erred in applying the Town's noise standard rather than the 55-decibel standard applied by the Environmental Board in evaluating projects under Act 250. Although the conditional-use section of the Regulations directs the DRB to "utilize Act 250 standards," § 540.III.B.3, the noise-performance standard is set forth in a separate, stand alone provision, § 750.1, and the trial court reasonably concluded, therefore, that the Town's intent was to employ its own specific noise standard rather than the Act 250 standard. See *Conservation Law Found. v. Burke*, 162 Vt. 115, 121, 645 A.2d 495, 499 (1993) (noting that, in attempting to discern legislative intent, we must view regulations "as a whole" looking principally to their language and structure).

of the area. The Regulations define "neighborhood" as meaning "in the same area; nearby[,] including but not limited to the area within sight and/or sound." § 540.III.B. Ample testimony, including that of applicants' noise expert, established that noise from the project would be audible from both residential neighborhoods, particularly the adjacent Lindale area, thus plainly satisfying the "sight or sound" criterion.

¶ 13. ■ As for the "character" of the area, the Town's zoning regulations direct the DRB to consider, among other things, "existing neighborhood uses, types of buildings, noise and traffic." Regulations § 540.III.B.1. Applying this standard, the DRB found, based on substantial testimony from residents and others, that much of the surrounding residential area had a "relatively quiet character" despite the fact that some noise was audible from other existing gravel operations. Applicants cite the opinion of their planning expert that increasingly "intensive commercial traffic" on Route 116 and the preexisting gravel operations necessarily define the area's character and weigh against an adverse-impact finding. The Town's zoning regulations specifically provide, however, that "the existence of one conditional use in a neighborhood shall not be interpreted as justification for another similar conditional use to be located there." Regulations § 540.III.B.1. Moreover, we have cautioned that the "*cumulative* impact of . . . added noise" and other adverse effects from a project in a mixed residential/ commercial area must be carefully considered to avoid "the risk that the character of the neighborhood will incrementally shift so that the industrial uses dominate." *In re John A. Russell Corp.*, 2003 VT 93, ¶ 33 (emphasis added). This was precisely the analysis undertaken by the DRB here. Accordingly, we find no merit to the claim that the DRB misconstrued the scope or character of the area affected.

¶ 14. ■ ■ Applicants additionally contend that the zoning regulations' definition of "neighborhood" is so vague as to violate due process. See *In re JAM Golf, LLC*, 2008 VT 110, ¶ 17, 185 Vt. 201, 969 A.2d 47 (noting that municipal zoning ordinances "are subject to the limits" of our Constitution, and we will not enforce those "that are vague or . . . that delegate standardless discretion to town zoning boards"). They assert, in particular, that the "sight and/or sound definition of 'area affected' is what gives rise to the [provision's] being unconstitutionally vague and overbroad." The

deficiency allegedly results from the provision's failure to identify a vantage point; applicants argue that measured "[f]rom the top of a tree on the top of a hill" the area within "sight and/or sound" could be many miles in scope. We find no merit to the claim. The plain import of the rule is to include areas within sight or sound of *the proposed project*, in this case a proposed gravel pit operation adjacent to Route 116 in the Town of Middlebury, which provides a sufficiently clear and specific location from which to measure its impacts.

¶ 15. Applicants advance a similar claim with respect to the Town's noise performance standard, asserting that the DRB erroneously employed a "vague and unconstitutional 'customary or reasonably expected' noise standard." The foregoing is the extent of applicants' argument both here and in the Environmental Division. Apparently, applicants believe that anything other than a numeric decibel standard is unacceptable.

¶ 16. ■■ ■ It is not unreasonable for .the Town to establish noise limit standards that take into account surrounding uses and the expectations created by those uses. Although we have applied the constitutional vagueness standard in regulatory circumstances, we have noted that we are "dealing with an area where some imprecision and generality is necessary and inevitable" and "[o]ur void-for-vagueness test is less strict where the regulation is economic and the landowner can seek clarification of its meaning or resort to administrative processes." *Rogers v. Watson*, 156 Vt. 483, 491, 594 A.2d 409, 414 (1991). We also note that a number of courts have upheld similar qualitative noise standards against void-for-vagueness challenges. See, e.g., *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125, 127-28 (2d Cir. 2003) (holding that City of Burlington noise ordinance prohibiting "unreasonable noise" which "endangers the health, safety or welfare of the community" was not unconstitutionally vague); *Reeves v. McConn*, 631 F.2d 377, 386 (5th Cir. 1980) (rejecting vagueness challenge to ordinance prohibiting sound amplification that was "unreasonably loud . . . or a nuisance"); *City of Belfield v. Kilkenny*, 2007 ND 44, ¶¶ 1, 14-19, 729 N.W.2d 120 (rejecting void-for vagueness challenge to ordinance prohibiting "nuisance in the form of excessive . . . barking"). We agree with those decisions and do not find the ordinance here so vague that it is essentially without an ascertainable standard.

*Affirmed.*